Jennie Wingad #16347
BLACKLEY & WINGAD, ATTORNEYS AT LAW
2105 E. Murray Holladay Road, Suite 2
Holladay, Utah 84117
Phone: (801) 278-3700
jennie@blackleywingad.com

*Attorney for Plaintiffs*

---

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| CATHERINE A., and MARTIN K., *on their own behalf and on behalf of S.K., a minor*,<br><br>Plaintiffs,<br><br>vs.<br><br>CIGNA HEALTH and LIFE INSURANCE COMPANY, and VIKING GLOBAL INVESTORS LP,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 1:21-cv-00057-JNP<br><br>Judge Jill N. Parrish |

**COME NOW** Catherine A., and Martin K. on their own behalf and on behalf of S.K., a minor collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Catherine A. ("Catherine"), and Martin K. ("Martin") are natural persons residing in Wilton, Connecticut. They are covered by a fully funded plan, Viking Global Investors LP ("the Plan") provided through Catherine's employer, Viking Global Investors.

2. Plaintiffs' son S.K. ("S.K") is a resident of Wilton, Connecticut. As a beneficiary of his mother's health insurance plan, he received treatment at Viewpoint Center LLC

1

("Viewpoint"), a licensed residential treatment facility in Syracuse, Utah, from October 19, 2018, through December 14, 2018.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the Defendants do business in the State of Utah, the treatment in question was rendered in Syracuse, Utah, and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of S.K.'s denied claims from November 13, 2018, through December 14, 2018, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7. S.K. was evaluated at 2 years old by Connecticut State Birth to Three Program ("B23"), as he was only speaking a handful of words at this time. B23 label S.K. speech delayed, and he began speech therapy. Upon reaching age 3, S.K. was exited from B23 with no further speech therapy required.

8. Upon starting preschool at the age of 3, S.K. developed severe separation anxiety from his mother. S.K. stayed near his cubby for most of the time during the first month, slowly joining in activities as he became comfortable. After a few months of preschool, he was participating in all activities but remained cautious about his actions.

9. S.K.'s physical movement appeared more labored than his peers, he managed to keep up but was always towards the back of the group.

10. S.K. slept with his parents most nights, it was during this time that his parents noticed S.K. would stop breathing during his sleep. In addition, S.K. snored loud and constantly sounded congested when awake. He was evaluated by two ENT doctors and they both found he had enlarged tonsils and recommended his tonsils and adenoids be removed. This procedure helped his snoring and his breathing seemed less labored.

11. Around 5 years old, S.K. began to exhibit some destructive behavior in response to 5-minute time-outs placed on him for misbehavior. Almost every time S.K. was sent to a time out, he would knock over the floor or table lamp. S.K.'s parents had recessed lighting installed to avoid that danger, so S.K. would throw toys instead.

12. S.K. began full-day kindergarten at 5 years old. He adapted well to the classroom setting but struggled to process the lunchroom cafeteria setting, often vomiting during lunch period and subsequently being sent to the nurse. This occurred regularly for the first month, with intervention from S.K.'s mother and his teacher, S.K. was given lunchtime in the classroom as well as placing him next to a friend in the cafeteria, eventually, the vomiting stopped.

13. Around age 5 and a half, S.K.'s younger brother was diagnosed with autism and began therapies to support him. Given S.K.'s apparent difficulties processing sensory-rich environments and his mildly destructive behavior in response to time-outs, S.K.'s parents had him evaluated by an Occupational Therapist. The therapist determined that S.K. had poor self-regulation and motor coordination skills. S.K. attended occupational therapy weekly for about a year to help address these weaknesses with minimal improvement.

14. At age 6.5, S.K.'s Occupational Therapist recommended that S.K. see a developmental optometrist to evaluate his vision processing. It was then that S.K.'s parents discovered that he had convergence insufficiency. S.K. began wearing prism glasses to help develop his eye muscles the o work together. He wore the glasses for about 6 months before growing frustrated with them and refusing to do so.

15. S.K. continued to be extremely sensitive to sounds, which would cause him anxiety resulting in him remaining very attached to his parents during outings.

16. At home, S.K. seemed unable to sit for a small homework assignment or to read a short story.

17. At age 7.5, S.K. had his auditory processing evaluated. The audiologist found that S.K. presented with borderline auditory processing disorder. It was recommended that S.K. continue the FastForword concentrated program that he had begun a month prior to the evaluation. In addition, a psychoeducational evaluation was recommended to further explore attention and behavior symptoms exhibited in the home.

18. As a result, S.K. was then evaluated by a pediatric neuropsychologist who determined that he was socially less engaged with some degrees of somatization and social anxiety. It was recommended that he attend psychotherapy to address his behavioral issues at home and how he coped with stress, he attended this therapy until the age of 9.

19. S.K. started 3rd grade at a new school since his family moved towns. He made some new friends, although academic problems began to arise. S.K. began reading intervention and a positive behavior plan was implemented at home to help encourage S.K. to get his homework done. S.K.'s parents met with his teacher on numerous occasions to address missed assignments.

20.     S.K. started to have some issues with classmates. On one occasion he felt that his classmates were making fun of him because he smelled. S.K. and his mom met with the teacher and his teacher stated it was because he was sitting by the garbage, and the kids were avoiding the garbage. S.K.'s teacher offered to help him re-integrate with the peers the next day, but he declined stating he didn't want to be friends with them because they were mean, he was unable to see the benefit of working collaboratively to improve friendships. This is when S.K.'s social rigidity became evident.

21.     S.K. would often come home and tell his mother that children were unrightfully punished or made fun of at school. S.K.'s remaining years in elementary school were similar to 3rd grade, except he never asked for help socially. Instead, he would bring home general problems that the class as a whole had or an unnamed peer had.

22.     S.K. would begin each year with a drive to do well, doing most homework and turning in assignments, but by January his performance would begin to suffer resulting in parent-teacher conferences to discuss missed assignments. Positive behavior systems were refortified, and some improvement would occur, at the cost of significant involvement from his mother.

23.     Socially, with encouragement from S.K.'s parents, he would invite peers over for playdates. These usually went well as long as things were going S.K.'s way. If there was a conflict, S.K. would struggle to work towards a compromise. He did get invited to other friends' houses on occasion.

24.     Recreationally, S.K. played baseball in the Spring and Fall. He was an average player, though his reaction times seemed much slower than other players. S.K.'s dad, being a baseball enthusiast, was eager to be able to share the game with him, but it became clear that S.K.

didn't want his dad helping him and S.K. would get agitated when he would try to practice with S.K.

25. S.K. seemed happy to begin middle school, he enjoyed the freedom and seemed to adjust well to the change. Typical to years past, S.K. began the year strong but in January be began missing assignments so once again his parents contacted his teachers to help coordinate getting S.K.'s work done. He started acting out mildly, disrupting teachers and lessons.

26. S.K. was required to stay after school twice a week for extra help. Shortly after, he refused to go to school, exhibiting signs of depression, he stated he had nothing to live for, that his life was meaningless and that he would kill himself. S.K.'s mother brought him to his pediatrician who sent him to another doctor for natural supplementation to support S.K.'s serotonin levels. This doctor saw S.K. immediately and had a therapeutic talk with him about his struggles. S.K. left that appointment feeling good about things.

27. S.K. began some herbal supplements which seemed to agitate him. At this time, S.K. had begun after-school extra help and was attending a peer homework support group. S.K. made some close friends, these friends were also kids who were acting out in classes to gain attention.

28. S.K. would continue to throw things out of frustration, recessed lighting was not an option in their new home, so lamps were once again being knocked over. S.K.'s mother remembered one time that she found him running his hand over broken lightbulb glass on his carpet. S.K.'s parents had patched up small holes in walls that were made by kicking walls or throwing hard objects.

29. On March 23, 2018, an assignment that was allegedly done, was not completed and S.K. refused to go to school because of this. S.K.'s parents said he could stay home but gave

consequences for him and he was in agreeance. S.K.'s mother contacted the school about this avoidance, and it was determined that school counselors would come to the house that day to talk with S.K. When he learned of this, he immediately got agitated. He threatened to run away, but his mom told him he was not allowed to leave due to it being a school day. S.K. went upstairs to his bedroom and tore apart his desk with a closet rod. S.K.'s mother called a local mobile crisis unit to the house and upon arrival S.K. quieted down. The mobile crisis worker asked his mother to check on S.K., who was found sitting on his dresser, staring out the open window with the screen torn off and his desk destroyed. Upon seeing this, the mobile crisis worker highly recommended the police be called to assess the situation and that S.K. be brought to the ER for psychiatric assessment. When the police arrived, S.K. tried to create a diversion by letting the family dogs out of their crates, thereby distracting the police so S.K. could run away. S.K.'s mother got the dogs back into their crate and found him in his room.

30. S.K. was transported to the local ER, evaluated by the psychiatrist who recommended psychiatric hospitalization for further assessment and treatment. S.K. spent the weekend in the ER and was transported to Four Winds Hospital ("4WH") on March 26, 2018. He was diagnosed with DMDD and discharged 5 days later.

31. Upon discharge from 4WH, S.K. began private weekly psychotherapy. In April 2018, S.K. was entered into a diagnostic IEP at his school to perform academic, psychological, speech, and sensory testing. Immediate accommodations given included removing one of S.K.'s academic classes to free up time for him to go to the resource room to complete homework. Results from the school's testing indicated average to above average academics, some pragmatic speech deficiencies with regards to repairing social situations, and an ADOS score of 7, elevated primarily due to social reciprocity with areas of engagement and perspective-taking identified as weak.

32.     During this time frame, there were more instances of S.K. breaking objects at home in frustration with limits imposed on him. In May 2018, S.K. was evaluated but this doctor could not definitively diagnose him, but suspected S.K. had ADHD, ODD, and IED, primarily based on meetings with his parents, S.K. himself, and some diagnostic questionnaires.  The doctor prescribed sleep medicine to help S.K. fall asleep better as well as an emergency high potency antipsychotic medication for when he gets agitated at home.

33.     In May 2018, S.K. got agitated and began knocking over the kitchen chairs and kicking the wall in response to a consequence of misbehavior. S.K.'s mother told him to take the emergency medicine, but he refused. S.K. finally took it as his mother threatened to call the police if he didn't. As the effect is not immediate, S.K. continued to break things but did fall asleep about 30 minutes later. He woke up an hour later, still angry and kicking his wall. With doctor guidance, another high dose of the emergency medicine was given, and S.K. fell asleep after 15 minutes.

34.     On May 23, 2018, S.K. got agitated because of a limit imposed on him. He refused to take the emergency medication and proceeded to try knocking over his dresser, kicked his door off its hinges, tried throwing his bed, threw his mattress off his bed and, tore a large hole in the wall in his room. The police were called to the house and S.K. was non-responsive to them, his parents agreed to bring him to the ER. He spent the evening at the ER. The ER social worker felt S.K. did not meet the requirements for psychiatric hospitalization and he was sent home.

35.     S.K. was scheduled to go to a sleep-away camp for the first 3 weeks of summer, the family had planned 3 weeks of vacation and S.K. was to begin football in mid-August. It was decided that S.K. would continue weekly psychotherapy and re-evaluate after the summer.

36.     S.K.'s therapist never felt like he got past the getting to know you phase in order to work on S.K.'s deeper issues. S.K. had objections to attending a school field trip which was

upsetting to his mother. He stated he didn't want to go with no reasoning behind it but agreed to think about it. Upon leaving therapy S.K. told his mother that he wasn't going, no matter what.

37.     On June 16, 2018, S.K. got agitated and began escalating, saying he was going to break things. While S.K.'s younger brother was listening to all going on, S.K. stated he was going to murder his mother. His mother told him to take his emergency medication, or she would call the police, S.K. refused while throwing the pill on the floor and went after his mother. S.K.'s mother restrained him for a moment and then released him, the dog was barking and S.K. threatened to stab her. The police were called, but S.K. took the medication before they showed up. S.K. was transported to the ER. He was evaluated by the ER psychiatrist and it was determined that S.K. should go to 4WH for further psychiatric treatment. It should be noted that S.K.'s younger brother was still terrified of S.K. due to his statements. This anxiety S.K.'s younger brother has is exacerbated by the preservative behavior which is typical of children with autism and will take extensive therapy to remedy.

38.     On June 27, 2018, S.K. was admitted to 4WH. He was prescribed a different anti-psychotic to take daily and continued with his sleep medicine. S.K. was discharged on July 3, 2018, with a plan to start the 4WH partial hospitalization program ("PHP") on July 5, 2018. While driving home S.K. became agitated about starting PHP, within a mile of 4WH, S.K. was kicking the dashboard, passenger window stating he did not want to attend, he didn't want limits on his electronics and that he was going to break things when he got home. S.K.'s mother drove him to the police station, on the way S.K. stated he would never go back to the hospital, that he would hang himself in the back of the ambulance and he would rather be dead than be at 4WH.

39.     Police got S.K. out of the car, an ambulance was called, and he was brought to the ER. He remained in the ER overnight and was transported and admitted to 4WH on July 4, 2018.

9

S.K.'s medications were increased, resulting in him being tired all the time. The clinical diagnosis remained DMDD, but a possible autism diagnosis, as well as depression were discussed as potential causes.

40. At family sessions at 4WH, S.K.'s coping skills were discussed for when he was feeling agitated. The therapist typed these skills up for S.K. to have when he went home, and he was discharged on July 12, 2018.

41. S.K. resumed therapy but his therapist refused to treat him anymore as she did not agree with his discharge home and state that S.K. needed a residential treatment program. S.K. began seeing a new therapist for medication management. The therapist's initial assessment of S.K. indicated that he seemed very sad, her diagnosis at the start of sessions was anxiety and ADHD, progressing to DMDD after a few sessions. The family also began therapy with the same therapist to discuss family dynamics and how to better manage S.K.'s inflexibility and a low tolerance for frustration.

42. During the summer, S.K. developed severe hand tremors, a possible side effect of the antipsychotic medication he was taking. He was weaned off the medication but remained on sleep medicine. The remainder of the summer was uneventful, although S.K. grew distant from his family.

43. On September 26, 2018, S.K. stayed home from school sick, he had a scheduled therapy appointment that afternoon. Around noon S.K. felt better and at 3:00 P.M., when his friends got out of school, he planned to meet up with them, his mother reminded him he stayed home from school and could not go out with these friends and reminded him of his therapy appointment. S.K. stated he would not go to his therapy appointment and that he was biking to town, his mother told him she would call the police as he was running away. S.K. called his friends

laughing at his mother's plan, his friends called his mother inappropriate names. S.K. did attend therapy this day but he did not participate, and this was S.K.'s last day of individual therapy. S.K. was still agitated and was threatening to bully his younger brother, following his mother around stating he wanted to leave and threatening to break things. In the evening S.K. was sad and stated he wanted to go to a foster home or orphanage, somewhere away from his family.

44. On September 27, 2018, S.K. came home from school insisting that he was having a sleepover at the house, his mother reminded him that he did not earn this privilege back yet. S.K. stated he wanted to go back to 4WH and starting breaking things until his mother called the police. The police called for an ambulance to bring him to the ER where he spent the night. Overnight, S.K.'s mother called Kids in Crisis ("KIC"), located in Greenwich, Connecticut. A KIC counselor went to the ER the next morning and offered to have S.K. come to stay at the KIC shelter and presented him with shelter rules, he refused this option. The hospital psychiatrist and social worker, along with the KIC counselor stated upon discharge that S.K. would need to actively participate in therapies and use coping skills.

45. S.K. was discharged on September 28. 2018 and within an hour began throwing plates because he didn't have access to his phone. S.K. was brought back to the ER in which the social worker arranged to have him transported to 4WH for further psychiatric assessment. 4WH psychiatry began SSRI medication to try to treat the underlying depression.

46. On October 8, 2018, S.K. was discharged with a plan to attend the 4WH PHP. S.K. went to one session and stated he was bored and didn't fit in. On the drive to the following session, S.K. stated he would rather put a bullet through his head than attend PHP. He demanded that his mother turn the car around and call the police, he tried to grab his mother's coffee mug in the center console, but his mother grabbed it and wouldn't engage with him. S.K. reached into the

glove box, threw the car manual into the back of the car, tore the car registration and inspection certificates, and proceeded to stab the dashboard, side door, and center console with a screwdriver. S.K.'s mother reached the hospital grounds and went inside to get help. A PHP team went to the car and S.K. was calm but kept locking the doors after his mother would unlock them. S.K. was once again admitted to 4WH and the PHP team called a code orange to safely remove S.K. from the car. S.K. used an emergency tool that breaks glass and cuts seatbelts to smash the passenger side window, which at this point the PHP team was able to remove him from the car and placed him into a safe room for calming, and then escorted to his inpatient unit.

47. On October 10, 2018, S.K.'s therapists and parents tried to find an IOP program to provide S.K. with more intensive treatment. Upon speaking with Newport Academy ("NA") in Greenwich, Connecticut, an admissions counselor stated that S.K. would need a higher level of care than an IOP would provide and recommended their short-term residential placement in California. NA evaluated S.K.'s clinical records and determined that he needed a higher level of care than they could provide, one which would include a locked-down facility. Viewpoint Center ("Viewpoint") was an option that could provide S.K. with the care he needed.

48. On October 17, 2018, it was agreed that Viewpoint could provide S.K. with the care he needed, and transportation arrangements were made.

49. S.K.'s mother told him about the plan to send him to a residential treatment center and he became agitated stating how he would escape from 4WH in detail, and how he would kill himself. S.K. His parents arranged for Right Direction Criss Intervention ("RDCI") to transport S.K. to Viewpoint. However, 4WH policy does not allow for transport companies on hospital grounds so S.K.'s parents had to discharge him and drive him to a bagel shop down the road where RDCI would be waiting to transport him to Viewpoint.

50. On October 19, 2018, S.K. was transported to Viewpoint. While at Viewpoint, S.K. was diagnosed with Major Depressive Disorder with Anxious Distress, Oppositional Defiant Disorder, and Intermittent Explosive Disorder. Specific treatment plans were formalized during many discussions between S.K's parents and Viewpoint's therapists and psychiatrists. Upon discharge from Viewpoint, S.K. began attending 4WH PHP program where he actively participated in group and individual sessions.

51. On December 28, 2018, S.K. was discharged from the 4WH PHP program. He attended weekly therapy sessions at Contemporary Care located in Danbury, Connecticut, and saw a psychiatrist for medication management.

**Pre-Litigation Appeal of the Plan's Denial of Coverage for S.K.'s Care**

52. On December 12, 2018, Cigna sent S.K.'s parents a denial letter for his treatment at Viewpoint.

53. In this letter, Cigna stated S.K.'s treatment was denied stating that his "symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents". Specifically, Cigna stated that S.K. did not have ongoing symptoms of a severe and pervasive psychiatric disorder that resulted in significant impairments in multiple settings and that demonstrates a need for active treatment in a 24-hour supervised setting.

54. On April 15, 2019, Catherine submitted a Level One Appeal to Cigna for denial of coverage for S.K.'s treatment at Viewpoint from November 13, 2018, through December 14, 2018.

55. In this appeal letter, Catherine states "I have obtained a copy of Cigna's Residential Treatment Center Criteria, and after careful examination, could not locate Cigna's denial letter's referenced requirements that a patient is exhibiting ongoing symptoms of a "severe and pervasive

13

psychiatric disorder" in order to qualify for residential treatment. Rather, Cigna's RTC criteria read that "The child/adolescent has been diagnosed with a moderate to severe mental health disorder", which must cause an "impairment in function seen across multiple settings."

56. "As I researched Cigna's Acute Inpatient Mental Health Treatment for Children and Adolescents criteria, I found the following requirement for coverage, which appears to have been used nearly verbatim by Cigna: "The child/adolescent has been diagnosed with a severe and acute mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders that is significantly impairing functioning."

57. "In addition, I am concerned that this requirement of symptoms commonly reflected in an acute level of care to deny intermediate residential treatment violated federal parity law. Since our insurance plan is offered to a large group of more than 50 employees, it must comply with the Mental Health Parity and Addictions Equity Act ("MHPAEA"). MHPAEA stipulates that plans must not apply limitations or restrictions to mental health benefits which are not also equally applies to mental health benefits is called a non-quantitative treatment limitation ("NQTL") and is a serious violation of the MHPAEA."

58. Catherine also states that she "searched for copies of Cigna's skilled nursing and cognitive rehabilitation medical policies and could only locate their cognitive rehabilitation criteria. A look at Cigna's medical policy list shows that there is no established criteria admission and treatment at skilled nursing facilities. Even when examining Cigna's rehabilitation criteria, which is an analogous medical level to S.K.'s treatment at Viewpoint, I found that it does not contain any requirements taken from acute criteria."

59. On May 6, 2019, Cigna responded to the Level One Appeal upholding their denial stating, "your symptoms did not meet Cigna's Behavioral Health Medical Necessity Criteria for

continued stay at the 01001 Residential Mental Health Treatment for Children and Adolescents level of care as there was no clinical evidence that you were very likely to cause serious bodily harm to yourself or others due to a psychiatric illness."

60.     On May 29, 2019, Catherine submitted a request for external review.

61.     On June 6, 2019, the State of Connecticut Insurance Department responded to the request stating it could not be accepted due to missing documents.

62.     On June 20, 2019, the State of Connecticut Insurance Department sent Catherine a letter stating that a request for external review has been accepted and was conducted by Maximus.

63.     On August 2, 2019, Maximus sent a letter upholding Cigna's decision for denial.

## CAUSES OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

64.     ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

65.     ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

66.     In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) ) C.F.R. §2560.503-1(h)(3)(iii).

67. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for S.K.'s claim denial, written in a manner calculated to be understood by the Family; 2) by failing to see that S.K. was a threat to himself and others 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the S.K.'s claim.

### Claim for Relief for Violating the Parity Act

68. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

69. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

70. The Plan violated the Parity Act by denying provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy.

71. The actions of The Plan in failing to provide coverage for S.K.'s treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

72. The actions of The Plan has caused damage to the Family in the form of denial of payment of S.K.'s treatment.

16

73. The Plan is responsible to pay for S.K.'s treatment claim along with pre-judgment interest and attorney's fees and costs pursuant to 29 U.S.C. §1132 (g).

## **RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

74. Judgment in the amount of S.K.'s past due treatment claims from November 13, 2018, through December 14, 2018.

75. Pre-and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

76. An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

77. For such further relief as the Court deems equitable.


RESPECTFULLY SUBMITTED this 19th day of April, 2021.

BLACKLEY & WINGAD, ATTORNEYS AT LAW

*/s/ Jennie Wingad*
Jennie Wingad

*Attorney for Plaintiffs*